Okay, very good. So we have six cases this morning. The court will hear four oral arguments in four appeals, and the first appeal is docket number 23-1769, Causam Enterprises, Inc. v. ITC. Mr. Weinberg? You've reserved three minutes for rebuttal, correct? Okay, please begin. Good morning, Your Honors. Jonathan Weinberg for Appellant Causam. May it please the Court. This appeal presents three claim construction issues. I know that we also briefed an ownership dispute, which, based on the briefing, has seemed to have fallen out of the case because that's not... But could you get to standing? Do you have constitutional standing to even be here and pursue this appeal in front of this Court? Yeah, we do. We agree with the position that the Commission has taken, that this ownership dispute is not a constitutional standing issue to begin with. It's a 281 issue, so it's non-jurisdictional. There was no decision below regarding it. Ownership was contested below, though, wasn't it? It was. In front of the ALJ, there was a finding. Who concluded that Causam does not own this patent? Correct. But that finding was not adopted by the Commission, and so there's no finding for this Court to review on ownership. But don't we have an obligation to independently determine whether we have a standing? And that requires us, in this case, under the facts of this case, to actually look at ownership on our own, right? Well, the difference, and this is in the briefing for Appellees, is that 281 in ownership is a statutory standing issue. And under this Court's precedent in Lone Star, statutory standing is not... We're talking about constitutional standing. We have to show that you have a sufficient interest in the case. It means you have to have some sort of rights in the patent. Correct. Well, the parties agree that we do have constitutional standing, and whether there's patent ownership that's under 281, under this Court's precedent in Lone Star, that's specifically not a constitutional issue. So if I could quote Lone Star... Maybe not. I agree, but as I understand it, there's no other basis you've advanced for having constitutional standing other than ownership of the patent. Is that fair to say? I'm not sure that I understand the question. Well, okay. You're saying that you don't need to necessarily own the patent to have constitutional standing here. When evaluating constitutional standing, the allegations brought by the plaintiff or the complainant are taken as true. And here we've represented that we do own these patents, and for purposes of appellate Article III jurisdiction, that's taken as true. So that's sufficient. What authority says that when the question of ownership of the patent was disputed in the tribunal below, we at the Federal Circuit can just assume that you do own the patent and therefore have constitutional standing? Because it's not an issue that was brought here. So to quote Lone Star, whether a party possesses all substantial rights in a patent does not implicate standing or subject matter jurisdiction. That's statutory standing. That's correct. So we're not talking about statutory standing, which is different. We're talking about Article III standing. That's not something parties can just agree to.  Or that can be waived. It's something we have to assess in each and every one of our cases. Right. And it wouldn't apply at the ITC because that's not an Article III court. Of course. So it's something new here. So in front of this court, and I'm sorry if I'm sort of repeating here. Basically, if you're saying that you're the patent owner, all you really need to do is say, doesn't that just mean we need to assess whether you're in fact the patent owner based on the record before us? I believe that the standard is that our representations on appeal for purposes of evaluating jurisdiction are taken as true. We represent that we own these patents. And whether or not there was a dispute below, there's no decision below saying that we don't own the patents. We represent we own the patents. There's no dispute about that before this court. And so that's taken as true. And so we have here, there's no dispute over Article III standing. We have a copy to jury. Can I interrupt and get at something related that's somewhat different? I don't understand the relationship, in your view, between this case and the IPR that's coming up on the same graph. If we were to conclude in the IPR that Claim 1 is unpatentable, do you agree that this case is lewd? Yes. The patent would be invalid, and we would no longer be able to assert that at the ITC. And sometimes there's a second follow-on question to a lewdness conclusion, which is what exactly would we do? One possibility is to dismiss the appeal. The other is to make it a remand with instructions to the commission to dismiss the appeal. Do you have a view about which of those would be appropriate and whether it would matter to you? I don't. I think whatever the court decides to proceed on would be the court's prerogative. I could simply hold on to the opinion until the IPR opinion is final and then dismiss under Rule 36 or otherwise remand. It's up to the court completely. OK. I'm sorry. You had some merits arguments. Yes. We have three claim construction issues. I don't know if the court has particularly focused on one of those, because I'm sure we don't have time for all of them. So if there are particular questions, let me know. Otherwise, I'll proceed in the order. I'm sorry. If I have a view that I'm willing, the other microphones are doing just fine for me. But the microphone is not doing well for me. I don't know if there's a solution to that. I'll speak more loudly. Hopefully, that will help. As I said, I'll proceed through the issues in the order they were briefed, unless the court has specific questions on specific ones of these issues. I think that's a good order to proceed on. All right. Our position on what is measurement and verification data is a pretty simple measurement and verification data is data for measurement and verification. That's how it's described in the specification. You have no definition of measurement and verification data. What you do have is a description of a measurement and verification process. Now, no embodiment sends a reduction in consumed power, like the appellees argue. The only thing that these embodiments send is, well, not the only thing, but what they send during the event is run time. What these embodiments describe is during a demand response event, there's some decrease in run time, and that run time is sent to the utility to perform measurement and verification. This is the accused product you're talking about, right? The accused system? The accused system certainly does this. I'm talking about claim construction at the moment, but we could talk about infringement as well. The accused system does perform this function. But it doesn't send any meter readings, right? Yeah, that's right. But there's no requirement in the claim construction or no justification for reading a requirement of meter readings into the claim term measurement and verification data. And I'm happy to talk about the analysis that the ALJ performed and why that's wrong. You're talking about claim construction? The claim construction. Okay. So the ALJ's analysis is at page 78 of the appendix, and it begins with what kind of looks like a claim construction. It says measurement, according to Mr. Forbes, the inventor in his deposition, is raw measurement from a meter or a submeter or from any device that's capable of performing measurement. It's a bit tautological there. It's measurement is anything from a device capable of performing measurement. There's nothing in that deposition testimony that says it had to come from a meter has to be power. There's simply no support for that. And if you look at Mr. Forbes' testimony that is cited at page 78, he says explicitly that, quote, measurement can be in the form of a runtime. And so that Forbes deposition testimony and testimony does not support any requirement of a meter reading or preclude runtime in any way. When the ALJ went on to do the non-infringement analysis, he said, well, Resideo can't infringe because it doesn't read meter data. Where did that come from? There's no requirement in that measurement definition. We just read it to read meter data. And he also said that runtime data is insufficient because the measurement verification process, not just the data, but the process requires at some point taking actual measurements of power, such as baseline. And this really conflates the measurement and verification process with what is measurement and verification data. Measurement and verification data includes the runtime. Perhaps the process requires other information like how much energy this appliance would have taken during the runtime. But that's not the definition of measurement and verification data. And you can see there's no support for that based on what it is that he cited there as well. The same Forbes deposition testimony. And in addition, the witness statement of Mr. Dickinson had a question. Doesn't this patent specification describe that the whole point of the patented invention is to take these meter readings so that you could send that back to some server to run a bunch of calculations to figure out exactly how much power was consumed during some control event and then compare that to what would have happened had there been no control event. And then you can much more accurately calculate what the actual reduction in power was. The second part of that is correct. So there is a description of how you do measurement and verification in the patent, column seven, and again at 20. But I guess my point is, if I'm understanding the patent correctly, then the meter reading is a key element. I mean, that's the whole point is to send information back so you can run these kind of calculations. And if you don't send that back, I mean, the runtime data, I don't know why the server even needs the runtime data. It doesn't already know what the length of time is for the control event? What the specification sends back, what it describes, is not a sending back of power measurements. It describes taking a baseline, how much is being used normally, and then taking a runtime during the event and sending that runtime during the event. You can see that. You know what might be helpful is if you pointed to us, what part of the specification are you relying on? Sure. For example, column 21, line 48 talks about using runtime for MNV. And I'm happy to read from that section if it will be helpful. It says there that the database record for each active load client contains the actual amount or average amount of power that would have been used, right, that's the baselining, by the active load client during the last cut event, along with the amount of time that each controllable device was turned off. The power savings application that's at the utility uses this information, the amount of time, to calculate the amount of power in megawatts that was saved. So all of the embodiments simply describe that during the event, the thermostat is sending back runtime data, not power measurements. In fact, I don't know. I guess there's other embodiments that are doing the meter reading, right? I'm not aware of them. If you have ones that you want to point to, I can take a look at them. But the other section that describes measurement and verification is in column 7, and it describes a similar process. This is about the power supply value? Well, the power supply value is something that's calculated by the utility in the back end on servers. What this describes is that because the amount of power consumed by each specific load is system could determine precisely which loads to turn off and track the power savings. And then it tracks the amount of time that these devices were turned off. And it's calculated at the meter, right? No. The power supply value is calculated at the server. It says the power supply value is calculated at the meter or submeter. It's line 28 or 37. Or at any device controller that measures power within the standards supplied. If you read a little bit farther up at the first sentence of the paragraph, furthermore, based on the reduction in consumed power, the system and methods of the present invention provide for generating at the control center a power supply value. And the control center is the server at the utility. But I understand that there is that next sentence that says that you can measure some reduction in the meter potentially. But this does describe that it's being calculated at the server. Can I just switch to a different topic? Sure. Is it right that if we get to the merits here, the non-infringement determination can be supported independently on the basis of the identifier controllable device not having the finding that what we map that onto, the relays inside the thermostat are not a controllable device? Yeah. There are three different independent tank constructions that we would have to win on all three to win here today. And the power control message is one of those independent bases. What was wrong with the commission's finding on that part? The rule is the controllable device has to be addressable through IPs or maybe something similar, but simply closing the circuit to allow current to flow is not that. Well, there's two issues. The first one is that the commission didn't make any finding about this for Residio's thermostats on the 268 patent. There was simply no actual analysis. All of the analysis. That was borrowed from, I guess, Appendix 94 or around there. But I didn't see any argument that that didn't flow back into around page 74 or 78 or whatever it was on Residio's because the chief ALJ did say he was deciding in Residio's matter. Both brands. The analysis got delayed. All right. So if we were to take the analysis from the ITRON patent, there's two analyses they  One from the 552 patent, which is completely inappropriate because there's different claim language that says specifically that the controllable device has to have an IP network. So that's different. They can't borrow from that different claim language. The other place that they borrow from is the ITRON analysis. Procedurally improper. We've said that a few times to do that. But even if it's not procedurally improper, it's wrong for a few reasons. Number one, it contradicts the DI analysis, which came to the exact opposite conclusion that IP addresses are not necessary. That wasn't adopted by the commission. But that does show. I'm sorry. I'm sorry. DI. I don't know what those letters mean. I'm sorry. The domestic industry analysis. Thank you. In the domestic industry analysis, the court came to the exact opposite conclusion saying that the relays are the controllable devices in this claim. So as for the requirement is IP addressable, they borrow from the ITRON analysis. And what is the ITRON analysis? The CLJ analyzed the ITRON device. ITRON is a different respondent. And what the CLJ cited for ITRON was Paradiso's expert witnesses testimony. But this expert witnesses testimony has no weight because it's not a claim construction issue. There's no expert doesn't say I looked at this patent. Sorry. The expert did say I looked at the patent. This is what I think it means. But that's just an expert opinion. It's extrinsic evidence. This court is perfectly competent to look at the specification, decide de novo whether or not there's a requirement of a IP addressable controllable device. I don't see that requirement. You have to give, if an expert's going to talk about what a term means to a person of ordinary skill in the art, that would be reviewed under a factual standard, like for a clearer, right? Yes, certainly any factual representations that he makes about a person of ordinary skill could be some deference, too, of course. But it was simply a line citation saying this expert said so. And therefore, this is what this means. Mr. Weinberg, we're way out of time at this point. We'll give you a little bit of rebuttal time, OK? Thank you, Your Honor. I appreciate it. OK. Good morning, and may it please the court. I'd like to begin with jurisdiction. The court seemed a bit concerned about it. And here, there's no dispute that the commission made a determination, a final determination under Section 337. And that final determination- Right, but I don't understand the ITC. What is its determination as to who owns this patent? I mean, the commission didn't determine that because it didn't have to. Under Beloit, the court allows the commission to make a determination on one or more dispositive issues. For Article III standing, though, there's a different requirement. That's correct. And so what do you think needs to be shown for Article III standing? They had to show an injury in fact, right? And that is shown by the commission declining the exclusion order. That is what they claim to be the injury in fact. They're alleging that they're the patent owner. Right. If they're not truly the patent owner, what is their interest? I mean, in Schweindemann, this court said that ownership of patent doesn't implicate standing. Right, that is what the court said in Schweindemann was because Ms. Schweindemann, whose complaint contained allegations that she owned the patent, that was sufficient for the court to invoke the Article III power. It wasn't necessary for the court to actually make a decision on who actually owns the patent. We have slightly different, maybe more than slightly different circumstances here, where your administrative raw judge took a lot of evidence on a contested question as to who owns the patent and went very carefully through all that and reached a determination that COSM does not own this patent. That's correct. That the patents were signed away before COSM could ever take ownership. So we have a very real finding and the ITC didn't adopt it, but it didn't reject it either. It, for whatever reason, just chose to completely sidestep it. And so at this point, that puts us, I think, in a bit of an uncomfortable spot as to just, should we just do what the ITC did and turn a blind eye to the ALJ's findings and assume that because COSM wants to assert that it owns the patent, we should just accept that in light of the fact that the ITC decided to ignore a highly contested issue? I mean, here it wouldn't make any difference. The reason being that... Well, we have to decide one way or another whether we're going to reach the issue. Right. I mean, if the Commission had found a violation of Section 337, the Commission would have decided the ownership issue. Here, the Commission determined that infringement was straightforward because COSM didn't really present any evidence on anyone actually practicing, using the Residuals Thermostat, practicing these limitations. The Commission found that to be an easy determination, and so the Commission took no position. You're not talking about constitutional standing right now, are you? You're talking about something else. What I'm trying to explain is why the Commission didn't decide the ownership issue. But you understand the concerns we have. We've been going over this now for a few minutes. I do. I appreciate the concern the Court has. The response the Commission has is that in the Commission's view, when the Commission makes a final determination on the merits, right, this Court has exclusive jurisdiction to... But does COSM have standing? That's a different question. Right. I mean, before the Commission, though, You keep going back to before the Commission. We're now all together here at the Federal Circuit. We now have to figure out what to do here at the Federal Circuit, not what happened one or two years ago at the ITC across town. And what we say in our brief is that the constitutional standing is the injury, in fact. It's for the alleged. And the injury being the Commission not giving them the exclusion order. Can I just add to this? So this kind of question comes up with regularity in appeals from the Patent Board by unsuccessful challengers to pass. And we have said, by Jennings, I think is the case that I particularly mind, following the D.C. Circuit and a bunch of other circuits, that when there's a situation, as is quite common, when there's an appeal from a non-Article 3 tribunal, and non-Article 3 tribunals don't care about Article 3 standing, that it frequently is an issue whether the appellant now meets the Article 3 standard. And we have said that the test is not simply do they assert it, which is effectively the standard for judging standing at a motion to dismiss stage, but we borrow the standard for determining standard from the summary judgment stage, as articulated in the Supreme Court case of Mbuna. That requires looking at the facts, not just accepting the work. Here, that seems to come down to the simple question, whether the, how to read these legal documents, the assignment documents, doesn't it? Right. I mean, Judge, I mean, whether to this court said in Lone Star, right? In Lone Star, the court actually explained. Lone Star did not involve this particular question. And I don't remember the facts of Schwendemann. My vague recollection is that the sentence that you read from Schwendemann is in the course of discussing something else, and that that issue was not actually there. Lone Star was about how you can have a Article 3 injury, in fact, interest that falls short of ownership. This isn't that case. Here, it's ownership or nothing at all. I mean, Judge, I mean, the commission's reading of Schwendemann, right, is that an allegation was sufficient in Schwendemann, which is what they had here before the commission. Before the commission, they did allege patent ownership. In Schwendemann, was it contested? It was contested. I believe it was contested. When was the issue, when was the case decided? Schwendemann was decided in, I mean, it was decided after Lone Star. I don't have the date. Did the lower court decide the issue? I believe the lower court did find that Schwendemann did own, asserted, asserted an assignment was assigned to, was assigned to. She, I believe the lower court did decide the issue, but we didn't. I understand that. I understand that, Judge.  Yes. There's a bit of a gap here with the commission's decision, which now creates a conundrum for us. Yes, I do appreciate the court's concerns, and I will definitely take the concerns back to the commission. But we think that here, I mean, what the commission did, because it also created a little bit of a, a bit of a conundrum, if you will, for the commission to make a final determination on the merit, which gives this court exclusive jurisdiction, and somehow still be able to shield that from this court's jurisdiction by no decided ownership. It sort of puts the commission in a little bit of a, I don't think that should be the right result. I think once the commission makes a final determination on the merit, and the 1295, this court has exclusive jurisdiction to review that. But I do appreciate the court's concerns, I do. Can you address the, I think sort of discuss two different aspects of the merit. I guess the one that I'm interested in hearing your view about is the issue of the identifying the controlling. Correct. The controlled type. I mean, counsel for Cosom made a statement that the commission didn't make any findings. The commission did. The chief ALJ, this is an APPS 68 to 69. Right, I'm just, I guess I just want to hear about the merits of the question. Forget about what you're just about to say. Why is Cosom wrong in challenging the merits determination that that claim element is not bent? Cosom is wrong on two different grounds. The first of one is its claim construction. Its proposed claim construction is not correct. Right, it reads the and as an or. Right, the claim limitation requires two and. Okay, right. I'm going to, as I say these days, spot you that. I'm getting down to, within that, they still have to have an identified control device, I think that is the language. And the determination, folks, the sole thing I'm concerned about right now is whether the chief ALJ was reversibly wrong in saying that the accused control device, namely relays inside the thermostat, are not control devices. That's the only thing I'm interested in right now. Right, the chief ALJ was correct. He relied on the evidence, the testimony of the expert. The expert's name was Amundsen. And the testimony said that for a demand response, the residual does not, so when the load management server sends the power message, it does not identify any controllable devices. It does not identify a relay, which is what they claim to be the controllable device. And the testimony is, if you want appendix number from the ALJ, it's at APPS 68 to 69. And he cites the testimony of Dr. Amundsen, which is APPX 4009 to 4010. And that testimony is what the judge relied on, which is entitled to substantial evidence review. The ALJ also found that the relays cannot be the controllable device because these relays don't have any identifiers. The relays don't have any IP addresses. They actually concede to that in their brief on page 49 of the blue brief. They concede that the relays don't have any name or address, so there's no identification of a controllable device. I don't think that's in dispute. But they seem to claim that it's somehow implicit, that somehow it doesn't have to be identified, that a broadcast is sufficient. But within this claim, a broad broadcast is not sufficient. The claim requires an identification of a specific controllable device so you're able to determine how much power is saved per the device. If I may briefly touch on the measurements and verification, let me take... I know my time is running out. I think you're going to have to rely on your co-counsel. Thank you, I will. Thank you, thank you. And may it please the court and Judge Chin and Judge Stoll, I'll speak a little bit loudly, even though we're close to each other, for the benefit of Judge Toronto. And for folks, what is worth the microphone problem got solved, so you can speak any way you'd like. Excellent. I may still speak loudly out of nature. So I do want to... I will turn to the first claim structure that Judge Chin, you were just asking about. But first, I want to talk a little bit about where Judge Toronto, where you left off, asking about the controllable device, which COSM alleges is the relay. So the power control message must... that message must identify the controllable device. Here, there's no dispute that the message sent to the residio thermosets does not identify any relay, any alleged controllable device. So that's not in dispute. And what COSM says is, well, okay, it doesn't identify the relay, but the message is sent to a thermostat. So implicitly, COSM says, it's identifying a relay. That's wrong. The judge, the chief ALJ found, and the commission affirmed, that the messages do not identify any relays on the thermostat. That's supported by substantial evidence. That alone resolves the whole case, because COSM has to win all their disputes. But there's more on the same issue. As my colleague for the commission explained, the commission found that the relay does not qualify as a controllable device. The claim separately requires that the controllable device disable the electric power flow to the HVAC in this case. That never happens. A relay within a thermostat has no knowledge of anything going on at the HVAC. The commission found that, unlike a smart breaker, a relay does not sit in the direct line of power to a given appliance to interrupt the flow of current to that appliance. It has, a relay has no ability to cut the, to disable the electric power flow to an HVAC. There, and there are more beyond that, but any one of those reasons would kill COSM's appeal because it impacts the control, the power control message requirements. Turning Judge Chen to the other claim term that they've disputed, that my colleague at COSM argued, that's the one that requires the measurement and verification data. In argument this morning and in their briefs, COSM is very keen to only focus on that four word phrase of measurement and verification data, forgetting the rest of the phrase, which is that the data must correspond to the reduction in consumed power. And Judge Chen, to your comments at the, your questions at the beginning of the argument today, this patent is all about calculating precisely how much load is diminished on an HVAC, in this case, instead of merely providing an estimate. Residios accused thermostats don't do any of this. And to be clear, only the thermostats are at issue. This is an ITC case. Only the thermostats are imported. There's a stipulation that the parties entered that the AOJ cited in listing the accused products. So all the things that happen at that backend server are not an accused product. They cannot be in front of the commission and point to those things. COSM tries to muddy the waters by mixing it all together, but they cannot do so reasonably. The... I guess they're trying to say the runtime data is enough, because that is at least some of the data that is needed in order to calculate the reduction in power. They do say that. The problem with that argument is for residios thermostats, they do not calculate runtime data. The runtime data calculations only occur at the backend server called connected savings. What do you want whether claim construction-wise runtime data is sufficient? Is it your view it's not sufficient because it doesn't correspond to reduction in power? Indeed, that is correct. That is our position. But even if for the sake of argument runtime does count, the relays in the thermostats, I should just say the thermostats, never calculate runtime data. It's admitted, and there was evidence showing that that only happens at the backend server, which again is not accused because we're here in the ITC and the backend server is resident in the United States. It's not imported. The only thing the thermostats generate, if you even want to call it that, is relay status information. Whether a relay has been opened or closed, the thermostat will send that relay status information to the backend server. The backend server can then use that information and it can infer, the ALJ found, whether the device may have been on or off. It doesn't actually know because if, for example, the HVAC was already off, then flipping the relay to turn it off doesn't save any power. The thermostats that are accused have no knowledge of any of this. The whole patent, to circle back, the whole patent is about monitoring and calculating precisely in kilowatts on a per customer basis, on a per device basis, exactly how much power is being saved. Instead of merely providing an estimate. Before we run out of time, would you address, Stan, in your view on whether this court, or I guess I should say, whether COSM has standing in this case? I will. And the first thing I'll say about that is to Judge Toronto's question earlier, is if this court does affirm, as I think it should, the unpatentability finding of claim one in the IPR, which is the third argued case this morning, the Ecobee IPR, that would moot this appeal here on the ITC and the court could avoid the question entirely. Does Resideo think COSM owns the 268 patent? Resideo thinks Resideo and ITRON co-own the patent. I'd be happy to walk through the history. It's what the ALJ found. Basically, the short of it is... Right, but the 2007 assignment said Mr. Forbes was assigning away a particular application and any divisionals, reissues, continuations, and extensions thereof. And the 268 patent issued off of a continuation in part. So it seems to be... Continuations in part seem to be missing from the 2007 assignment. A continuation in part, and we cited in our brief a case where using similar language, this court encompassed continuations in part. But a continuation in part... I'm just trying to understand your view. Do you think a continuation and a continuation in part are the same thing? In the patent law context, no. Of course, a CIP, a continuation in part will include new matter. But in the licensing context and assignment, a continuation in part is a flavor of continuation and it's certainly an extension, which is also included. Why, when you look at the language of the agreement as a patent lawyer, why wouldn't you look at those terms from the perspective of the patent lawyer? I mean, they're talking about patents, so why would there be a different understanding? I think if we had a time machine, we'd go back and make what is, I think, understood here, make it more explicit. But this court has held that... That's not a good answer. The time machine. I mean, so my question was, you're a patent lawyer, so why wouldn't you understand a continuation and a continuation in part to be different things? I mean, an agreement was written that does not have the language continuation in part in it. It has every other flavor in it, but that one, so it seems intentional. I would also say an extension is not a patent law term of art, and you can tell by this overall phrase of all patents that may be granted, therefore, and... Extension of the patent term, that's what I was thinking it was. I actually think that is a patent term, don't you? I do think that is a type of extension, just as a continuation in part is a type of continuation. And this court has held, I don't have the case in front of me, it's in our brief, that the language including continuations that does not mention CIPs has included a CIP, a continuation in part before, and this language is the same. I'm sorry? Regents of the University of New Mexico versus 9th? It is that case. Okay, that case dealt with multiple different documents that it said when all read together broadly cover the CIP in question. It didn't just say, well, the assignment said the magic word continuation. We, the Federal Circuit, are going to deem continuation to encompass not only continuations, but this other type of application called continuations in part. Yes, correct. That's the closest case that we found that could cover this sort of scenario.  Yes. You're out of time. Let's hear from Mr. Weinberg again. Thank you. We'll give Mr. Weinberg three minutes. Thank you, Your Honor. We've heard a few different issues. I haven't addressed the ownership issue as of yet. If you'd like me to address that, I could. That's correct. The 2007 assignment, there's two reasons why it didn't assign away that CIP. Number one, as you've identified, it does not include CIPs. And we rely on a case, Van Voorhis, which uses substantially identical language as the 2007 assignment. And what the court held is that in that case, it only assigned away one generation of continuations. So that was those. That opinion's a little ambiguous about what it meant in reference to second generation patents. How so? I could explain it to you now, or I could explain it to you in three months. I did look up what second generation was. I looked up the patents themselves and whether there were continuations in the second generation patents were continuations of the first generation patents. So I'm happy to provide that to the court in a supplemental filing, if you so wish. And Van Voorhis also included the term extensions in it. The terminology in that contract was inventions, all patents, or reissues, or extensions. In any divisional continuation, continuation in part or substitute, which is the same as in the 2007 assignment, which is said invention, all patents, all divisions, reissues, continuations, and extensions thereof. Doesn't include CIPs. So I think that's the majority of their argument on the ownership. And I think that if we interpret the contract properly there, there's no, the rest of the dominoes would fall. On the power control message, Judge Toronto was interested in, there's a few comments about that. I just want to emphasize again, this is another issue in which the ALJ ruled the exact opposite in his domestic industry analysis at appendix 145. He says, the controllable device in the domestic industry products may be the relay that is found within the load control switch. That wasn't adopted by this commission, but it does show that it's one of the issues that the ALJ came out the other way on. There's a lot of arguments that were created in the response briefs about how to justify that conclusion. We don't have time for all of them, but the major one was about whether or not relays have to be IP addressable. There's nothing in the specification, or even a theory of disclaimer or disavowal, or what in the specification would have you read such a requirement into the controllable devices. The ITC says that the specification touts the IP addresses, but the citations they provide don't show any disclaimer or disavowal. In particular, the closest they come is column 13, line 60, where it says that a controllable device can have an IP address. The other two citations deal with IP addresses of the client device. I'm out of time, so any other questions? Thank you very much, Mr. Longberg.